UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ORLANDO SMITH,                      )
                                    )
            Plaintiff,              )
                                    )
    vs.                             )        Case No. 4:05CV00360  AGF
                                    )
JO ANNE B. BARNHART,                )
Commissioner of Social Security,    )
                                    )
            Defendant.              )


**<u>MEMORANDUM AND ORDER</u>**

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security, denying Plaintiff Orlando Smith's application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et

seq.[1]  For the reasons set forth below, the decision of the Commissioner shall be reversed

and the case remanded for further proceedings.

Plaintiff, who was born on August 28, 1973, applied for disability benefits on

July 29, 2002, claiming a disability onset date of April 3, 2001, due to chronic obstructive

pulmonary disease (COPD), bronchial asthma, chronic bronchitis, allergic rhinitis,

depression, and side effects from his medications including fatigue, dizziness, and pelvic

pain.  He stated on his application forms that his severe respiratory problems began after

his service in the United States Navy in Saudi Arabia during Desert Storm.  Plaintiff's

---

[1]    The parties have consented to the exercise of authority by the undersigned United
States Magistrate Judge under 28 U.S.C. § 636(c).

application was denied at the initial administrative level, and he requested a hearing before an Administrative Law Judge (ALJ). A hearing, at which Plaintiff appeared with counsel, was held on January 7, 2004. The ALJ issued his decision on July 27, 2004, finding that Plaintiff was not disabled as defined by the Act. On December 30, 2004, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. Plaintiff has thus exhausted all administrative remedies, and the ALJ's decision stands as the final agency action.

Plaintiff had filed a prior application for benefits on December 11, 2001, also alleging a disability onset date of April 3, 2001. This application was denied initially on April 5, 2002, and was not further pursued by Plaintiff. Thus, the issue in the present case is whether Plaintiff was disabled at any time from April 5, 2002 through July 27, 2004, the date of the ALJ's decision.

Plaintiff argues that the ALJ erred in failing to properly address the Veterans Administration's (VA) determination that Plaintiff was totally disabled based upon unemployability, and in discounting evidence that Plaintiff had been rejected for vocational rehabilitation by the VA and had qualified for a handicapped parking permit. Plaintiff asks the Court to reverse the Commissioner's decision and remand the case to the Commissioner for appropriate remedial action.

## BACKGROUND

### Plaintiff's Work History

Plaintiff's earnings record shows erratic and sparse earnings from 1989 through

2001.  The only years in which he had significant earnings were in 1992, 1993, 1996, 1998, and 1999, in which he earned approximately $9,000, $11,000, $11,000, $24,000, and $17,000, respectively.  On his application forms, Plaintiff wrote that he had various unskilled jobs from 1989 through 1992, and that from January 1992 until the end of 1993 he served in the United States Navy.  From November 1993 until September 1997, Plaintiff worked at a carwash; and from September 1997 through November 1997, he had various other unskilled jobs.  In January 1998 Plaintiff began working as a mail handler for the United States Postal Service and continued in this position until April 2001, although he was frequently absent.  Tr. at 85, 131, 375.

**<u>Medical Record</u>**

The results of a preemployment medical examination and assessment conducted by the Postal Service on December 19, 1997, showed that although Plaintiff had a history of bronchitis, he was medically qualified to work as a mail handler without special accommodations.  Tr. at 180-85.  On April 10, 1998, the VA informed Plaintiff that it recognized that he had service-related COPD, but that the condition was 0 percent disabling.  Tr. at 205-07.

The record indicates that by April 1999 Plaintiff began missing work multiple times for medical reasons related to his respiratory problems.  Tr. at 247.  On June 21, 1999, the VA evaluated Plaintiff's service-related COPD as 10 percent disabling, entitling him to monthly payments.  This rating was based upon pulmonary function testing on April 27, 1999, showing a FEV1/FVC (forced expiratory volume in one second/forced

vital capacity) ratio of 78 percent of predicted value. Tr. at 203-05.

On August 30, 1999, pulmonologist Dellice M. Dickhaus, M.D., reported that Plaintiff had been under her care since August 6, 1999, for severe asthma. Dr. Dickhaus interpreted a pulmonary function study conducted on August 24, 1999, as showing that Plaintiff had "severe breathing obstruction with significant response to single dose bronchodilator." Tr. at 261-63.

On October 21, 1999, Wallace Spradling, a counseling psychologist at the VA, met with Plaintiff for consideration of vocational rehabilitation. Mr. Spradling noted that Plaintiff was on a medical furlough due to his respiratory problems, and that strenuous activity and a toxic atmosphere would possibly bring on an asthma attack. Mr. Spradling concluded that Plaintiff had a serious employment handicap. Tr. at 269-72.

On December 10, 1999, Plaintiff's treating allergist, Jeffrey P. Tillinghast, M.D., characterized Plaintiff as having fairly severe asthma with well-controlled symptoms. Dr. Tillinghast suggested that Plaintiff work at his job with the Postal Service during the day, in an atmosphere with low levels of dust. Tr. at 231. On December 16, 1999, Dr. Dickhaus likewise noted that Plaintiff felt that his asthma was exacerbated when he worked night shifts, and that it would be in Plaintiff's best interest to work days. Tr. at 262.

On February 8, 2000, Dr. Tillinghast wrote that Plaintiff, who had been off work since January 22, 2000 for medical reasons, could return to work as of February 10, 2000. Tr. at 232. On March 11, 2000, Dr. Tillinghast stated that Plaintiff had had an asthma

exacerbation on March 4, 2000, and could now return to work, recommending that he avoid dust and mold exposure, heavy lifting, pushing, pulling, and working more than 40 hours a week. Tr. at 234.

On April 8, 2000, Plaintiff went to the VA emergency room due to another asthma exacerbation. Plaintiff was given medication to help his sinus infection, insulin on a sliding scale to offset hyperglycemia anticipated from the steroid therapy, and his normal medications. On April 10, 2000, Plaintiff stated that he felt much better, and he was discharged that day. On April 13, 2000, Dr. Tillinghast noted that pulmonary studies still showed "some fairly severe air flow obstruction." Tr. at 235. On May 11, 2000, Dr. Tillinghast noted that Plaintiff felt well, and that his pulmonary function tests were excellent. Tr. at 238.

On September 10, 2000, the VA determined that Plaintiff was 60 percent disabled due to his COPD, entitling him to increased monthly benefits. The 60 percent evaluation was based upon recent pulmonary function testing showing a pre-bronchodilator FEV1 of 44 percent of predicted value and a post-bronchodilator FEV1 of 46 percent. Tr. at 200-02. On September 20, 2000, the Missouri Department of Revenue determined that Plaintiff had a permanent disability and granted him a handicapped parking permit. Tr. at 273.

The record indicates that Plaintiff was totally incapacitated and unable to work from June 6, 2000 to October 3, 2000. On October 3, 2000, he was permitted to return to light work with limited dust and mold exposure, with an anticipated return to full duty on

January 3, 2001. Tr. at 239. On December 17, 2000, Plaintiff went to the VA emergency room due to an asthma attack. He was treated with medication and discharged that day in improved condition. Tr. at 308-12. Plaintiff had another asthma exacerbation from December 22-28, 2000. On December 28, 2000, he was treated at the VA medical center with nebulizers and steroids. On December 29, 2000, an associate of Dr. Tillinghast's reported that an examination suggested that the asthma exacerbation was probably secondary to a viral upper respiratory tract infection, and that Plaintiff appeared to be doing much better. Tr. at 241-42.

On January 31, 2001, David Erasmus, M.D., examined Plaintiff and found that he had a history of severe asthma with frequent asthma exacerbations. He noted that Plaintiff was unable to do work which required moderate or heavy physical activity, such as lifting more than 20 or 30 pounds. Tr. at 372. On February 7, 2001, Dr. Erasmus examined Plaintiff again, this time diagnosing him with moderate asthma with frequent exacerbations, and noting that he would probably be better suited to an office job. Tr. at 374. Elbert Cason, M.D., a medical officer with the Postal Service, opined that pursuant to Dr. Erasmus's findings, Plaintiff would probably be better suited to an office position as a permanent restriction. Tr. at 372.

On August 9, 2001, Plaintiff again went to the VA emergency room. He was diagnosed with acute exacerbation asthma, given medication, and discharged in an improved condition. Tr. at 316-17. On September 6, 2001, five months after Plaintiff's alleged onset of disability, Dr. Tillinghast reported that since April 3, 2001, Plaintiff had

had asthma exacerbations that did not permit him to work, but that Plaintiff was responding reasonably well to his treatment and that although he still required multiple medications, he could return to work on September 10, 2001. Tr. at 246.

On September 26, 2001, the VA clinic noted, following a regular physician checkup, that Plaintiff reported that his asthma had been acting up lately, which he believed was due to the weather. Tr. at 321. On October 2, 2001, Plaintiff underwent a respiratory examination at the VA for compensation and pension purposes. The report listed Plaintiff's multiple medications, including two allergy shots per week, and noted that he was a nonsmoker. Plaintiff reported that he had to visit the emergency room about eight or nine times a year. An examination of the lungs revealed "very distant and decreased breath sounds." Tr. at 369-70.[2]

On October 8, 2001, Plaintiff went to the VA emergency room with shortness of breath. He was diagnosed with asthmatic bronchitis, treated with nebulizers, and discharged later that day in satisfactory condition. Tr. at 322-24. On October 18, 2001, Plaintiff was referred to an allergy clinic for his asthma problems. The clinic reported an FVC of 34 percent and an FEV1 of 23 percent. The report does not specify whether these results were pre-bronchodilator or post-bronchodilator values. Plaintiff was continued on his medications, with plans to find a better asthma control plan with allergy treatment. Tr. at 325. On December 20, 2001, Plaintiff returned to the clinic in improved condition. However, it was reported that he was overusing Albuterol. Tr. at 326.

---

[2]    One or more pages of this report are not included in the record.

On November 20, 2001, the VA informed Plaintiff that the evaluation of his service-related COPD was continued as 60 percent disabling, rather than increased to 100 percent disabling. The VA explained that a FEV1 of 40 percent of predicted value is required for a rating of 100 percent disabled, and Plaintiff's FEV1 was 44 percent before bronchodilators and 46 percent after. Nevertheless, Plaintiff was determined to be 100 percent unemployable because of the effect of his COPD on his ability to maintain a job. The VA noted that during his employment with the Postal Service from January 1998 to May 2000, he missed a total of 1,889 hours due to his COPD, and that his medical history showed frequent trips to the emergency room for asthma exacerbations. Accordingly, the VA assigned Plaintiff a "total disability evaluation based upon unemployability." Tr. at 189-194.

On March 15, 2002, consulting internist, Raymond Leung, M.D., examined Plaintiff. Dr. Leung noted that Plaintiff said he could walk two blocks before he needed to stop due to shortness of breath, lift up to 20 pounds, and walk two flights of stairs at a time. Plaintiff reported that he was using his Albuterol inhaler four times a day, had occasional night symptoms, and was on steroids for his allergies. Dr. Leung determined that Plaintiff had slightly decreased breath sounds, but that he was in no respiratory distress. Testing showed mild restriction and mild obstruction pre-bronchodilators, and that bronchodilators helped. Tr. at 375-77. On March 21, 2002, Dr. Tillinghast reported that Plaintiff had cut down markedly on Albuterol and was doing well. Tr. at 333.

On April 2, 2002, Stephen Kelly, M.D., a non-examining consultant, completed a

physical residual functional capacity (RFC) assessment form on Plaintiff. His primary diagnosis was asthma. Dr. Kelly concluded that Plaintiff was able to lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push or pull without limitation. Dr. Kelly noted that his determination was based upon a number of factors, including Plaintiff's admission that he could do light household chores and drive. Dr. Kelly found that Plaintiff had no postural, manipulative, visual, or communicative limitations. He did find, however, that Plaintiff had environmental limitations due to his asthma, and that Plaintiff needed to avoid concentrated exposure to extreme cold and extreme heat, and even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. Dr. Kelly also concluded that Plaintiff should avoid hazards such as heavy machinery and heights. Tr. at 382-89.

On July 3, 2002, the VA denied Plaintiff vocational rehabilitation and employment services, because the VA found that is was not reasonable to expect Plaintiff to be able to train for or get a suitable job. The VA stated that it based its decision on Plaintiff's personal interview, and his vocational, educational, and medical history, and that Plaintiff could reapply when he felt his situation had improved. Tr. at 208-09.

VA medical notes dated August 15, 2002, state that Plaintiff had severe persistent asthma problems, which had flared up because he had run out of some medications. In addition, Plaintiff reported that he had been unable to receive allergy shots because his insurance changed and he could not pay for the medications or treatment. The notes state

that the VA would make arrangements to have Plaintiff's medications started again. Tr. at 496.

On September 11, 2002, Saul Silvermintz, M.D., examined Plaintiff in connection with his application for disability benefits. Pulmonary function studies showed severe obstruction as well as low vital capacity. Dr. Silvermintz reported that Plaintiff's medications at the time included Albuterol, Servant, Flovant, Altrovent, an Albuterol inhaler, Singular tablets, Allegra, Prednisone, Amoxicillin, cough medicine, immunology shots, and Theophylline pills. Dr. Silvermintz noted that Plaintiff was not in any acute distress or discomfort that day, and diagnosed him with COPD and bronchial asthma, with a history of chronic bronchitis and chronic allergic rhinitis. Tr. at 390-92. Pulmonary function testing on that day showed a pre-medication FVC of 40 percent of predicted value and a post-medication FVC of 62 percent, which was interpreted as indicating severe obstruction as well as low vital capacity both before and after medication. Tr. at 395.

Plaintiff also underwent a Mini-Mental Status Examination on September 11, 2002. He scored a 10 out of 10 with respect to orientation, 3 out of 3 on registration, 3 out of 5 on attention and calculation, 1 out of 3 on recall, and 9 out of 9 on language. Tr. at 393. VA records dated September 12, 2002, indicate that Plaintiff was feeling depressed and wanted to talk to a VA psychiatrist. Tr. at 493.

On October 3, 2002, non-examining physician Dennis McGraw, D.O., completed a physical RFC assessment form. He determined that Plaintiff had the following exertional abilities: Plaintiff could frequently lift and/or carry less than ten pounds; stand and/or

walk at least two hours (but less than six hours) in an eight hour workday; sit about six hours in an eight-hour workday; push or pull without limitation; and occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. McGraw noted that Plaintiff had no manipulative, visual, or communicative limitations, but should avoid concentrated exposure to extreme cold and extreme heat, and even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. Dr. McGraw noted that Plaintiff's variable pulmonary function testing results that were in the record were mostly, and most recently, above severity-level listings.[3] Tr. at 400-06.

On October 8, 2002, Aine Kresheck, Ph.D., a non-examining psychologist, completed a psychiatric evaluation form on Plaintiff noting in check-box format that Plaintiff had no medically determinable mental impairment. Dr. Kresheck noted that Plaintiff was able to babysit 8½ hours a day, four days a week. Tr. at 408-20.

On November 12, 2002, Plaintiff went to the VA emergency room due to shortness of breath, fever, chills, and sinus congestion. A chest x-ray showed no lung infiltrate or pleural effusions. Plaintiff was diagnosed with asthmatic bronchitis, given medication, and discharged that day in satisfactory condition. Tr. at 489-91.

VA records indicate that on November 18, 2002, Plaintiff was having problems

---

[3] Pursuant to § 3.02 of the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (Appendix 1), a person of Plaintiff's height is presumed to be disabled if he has COPD with a FEV1 equal to or less then 1.65 liters. The Listing states that pulmonary function studies should be repeated after administration of a bronchodilator, and that studies performed without doing so cannot be used to assess levels of impairment in the range that prevents any gainful work activity, unless the use of a bronchodilator is contraindicated. Appendix 1, § 3.00E.

with depression and anger. His Global Assessment of Functioning (GAF) was assessed as 50,[4] and he was started on a trial basis on Gabapentin for irritability and mood instability. Tr. at 485-88. VA notes from February 18, 2003, indicate that Plaintiff was "somewhat depressed." He had been pawning household items to help his cash flow. He agreed to an increased dosage of Gabapentin and to taking Wellbutrin. Tr. at 480.

On April 28, 2003, Plaintiff reported that he was "very unhappy," did not want to do anything but sit at home and do puzzles, and was having multiple social and financial problems. The notes indicate that Plaintiff stopped taking Wellbutrin and began smoking a pack of cigarettes a day even though that exacerbated his asthma. Plaintiff was referred to a social worker for his social and financial problems. Tr. at 476-78.

On May 29, 2003, Plaintiff was admitted to the VA clinic for depression. He was diagnosed with major depression acute exacerbation. The tests indicated that Plaintiff suffered from mild expiratory wheezing, a dysphoric mood, and a flattened affect, and that his overall psychiatric condition was fair. Plaintiff was given antidepressants and discharged the next day in improved condition. Tr. at 431-71. Progress notes dated July 7, 2003, state that Plaintiff was depressed and had general dysphoria. Tr. at 428-29. VA records from November 25, 2003, indicate that Plaintiff was depressed with a sad

---

[4] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) 32. GAF scores of 31-40 indicate "major" impairments in social, occupational, or school functioning; scores of 41 to 50 reflect "serious" impairments in these areas; scores of 51-60 indicate "moderate" difficulties; scores of 61-70 indicate "mild" difficulties; scores of 71-80 indicate "slight" difficulties.

affect, that he was receiving supportive psychotherapy and had been taking Wellbutrin, and that he felt he had been depressed ever since his father left him at age 11. Tr. at 504.

Pulmonary function studies on December 6, 2003, showed a pre-bronchodilator FVC of 2.47 liters (47 percent of predicted); FEV1 of 1.35 liters (32 percent of predicted) and an FEV1/FVC ratio of 55 percent (compared to 85 percent predicted). Post-bronchodilator values were not recorded. Tr. at 511.

**Evidentiary Hearing**

Plaintiff testified at the evidentiary hearing held on January 7, 2004, that he was 30 years old, had completed high school and five quarters at ITT Technical Institute, was 6 feet 2 inches tall, and weighed 238 pounds. He testified that he had been in active service with the United States Navy in Saudi Arabia during Desert Storm. He stated that during this time he developed allergies, asthma, and reactive airway disease, which changed to COPD. He testified that following his honorable discharge, he worked at a car wash, as a mail handler for the Postal Service, and at various other jobs. Plaintiff stated that none of his jobs were successful, and that he had difficulties working because his medications caused side effects, such as body pains, dizziness, and exhaustion. Tr. at 33-39.

Plaintiff testified that during his three years working for the Postal Service, he had to miss work repeatedly because he was hospitalized and his doctors continued to prescribe him heavy dosages of medication. Plaintiff testified that the Postal Service fired him for bad attendance. Following his dismissal from the Postal Service, he enrolled at ITT Tech because he wanted to find a less strenuous job. He testified that he failed to

13

complete any programs at ITT Tech, partially due to the fact that he was hospitalized two times for his breathing disorders while enrolled there and was set back two times. Plaintiff said that he accepted that ITT Tech would not work considering his medical situation. Tr. at 40-41.

Plaintiff testified that the VA treated him for his illnesses, giving him allergy shots and trying different therapies in an attempt to cut down on the side effects he was experiencing from his medications. Plaintiff testified that he continued to experience the side effects, and that his symptoms were currently the same as when he was working, only they had become a little worse because his medications had been increased. Plaintiff stated that his depression was related to the lifestyle changes he had to make as his condition worsened. Tr. at 41-44.

Plaintiff testified that he wanted to work and worked hard to maintain his jobs, but that he could not do so because of his condition. He testified that as a result of his inability to hold a job, he and his four children had had to move three times, and that eventually he moved back with his mother and his four children moved in with their grandmother. Plaintiff testified that he currently lived with his girlfriend and her two children, because he could not afford to pay rent on his own. He stated that his girlfriend was employed, and that she and her two children, ages 13 and 14, did most of the household cooking and cleaning. Plaintiff stated that he could not do any cleaning because the cleaning agents would trigger his asthma. Plaintiff stated that he sometimes helped his girlfriend grocery shop, however, he could not shop for long periods of time

because he would experience joint and muscle pain. Plaintiff testified that before he exited the car to enter the grocery store, he had to use his inhaler, and had to use it again before he checked out at the store. Plaintiff testified that if he stood for too long he experienced pain, fatigue, breathing complications, shortness of breath, and back spasms. Tr. at 44-46.

Plaintiff testified that he could not drive longer than an hour, and only drove that much to go to the VA medical center. He testified that he became very dizzy and tired behind the wheel; that he experienced blurry vision and double vision, caused by his medications; and that he had previously been in an auto accident in the evening hours which caused him to cut back on night driving. Tr. at 47.

Plaintiff testified that he did not do any yard work, and that he had no hobbies. He testified that he did not exercise because he experienced fatigue and lacked motivation. He also testified that he could not take care of his own children by himself. Plaintiff stated that he only socialized with friends and family on holidays, and that he had difficulty on these occasions because he would have asthmatic allergic reactions to smoke or pets. Tr. at 47-48.

Plaintiff testified that he used a nebulizer every six hours except at night, unless he had a bad exacerbation, which would happen approximately six times a week at 1:00 or 2:00 in the morning. He testified that the nebulizer took twenty minutes to use. Plaintiff testified that he has experienced nervousness and tremors from the nebulizer, and that side effects lasted about an hour to an hour and a half. Tr. at 48-49.

Plaintiff testified that he could walk about 30 feet without discomfort or the need to use an inhaler.  He testified that extremely cold weather triggered his symptoms, and that merely standing caused his joints to hurt and severe pelvic pain.  Plaintiff testified that his doctors told him his Advair medication was causing the difficulties, but that they did not want to take him off the medication.  He stated that his doctors thought combining two clinical steroids worked best for him.  Plaintiff also stated that he had trouble sitting.  He testified that if he sat too long without moving, he would experience pelvic pain, back pain, and shortness of breath.  Tr. at 50-51.

Plaintiff stated that if he lifted anything over ten pounds, he became very tired and experienced shortness of breath as well as pain.  Plaintiff testified that if he had to climb a flight of stairs, he would have to use an emergency inhaler at the top and the bottom of the stairs.  Plaintiff stated that he only feels rested once he falls asleep.  He testified that in his spare time he occasionally read books, watched television, and maintained his medications, which he had to group into once daily, twice daily, and thrice daily.  He also stated that he napped every six hours.  Tr. at 51-52.

**Interrogatory Opinion of Vocational Expert**

Following the hearing and upon notice to Plaintiff, the ALJ asked a vocational expert (VE) by interrogatories whether a person with Plaintiff's vocational factors (age, education, and work experience), who had the RFC to do unskilled work, except for lifting and carrying more than 25 pounds occasionally and more than 20 pounds frequently and walking more than one to two blocks at a time, and who needed a relatively clean air work

environment and to avoid extremes of temperature and humidity, could perform Plaintiff's past relevant work. The ALJ responded in the negative. The ALJ then asked the VE whether such an individual could perform any jobs that existed locally and nationally. The VE responded that Plaintiff could be an assembler, security guard, information clerk, and sales clerk, and that there were over 1,000 of each of these jobs. The VE further responded that this would still be true even if the individual could walk only one-half block at a time. Tr. at 222-24.

**ALJ's Decision**

The ALJ stated that Plaintiff's 100 percent disability rating given by the VA in November 2001 was entitled to some weight, but that it did not prove disability under the standards established by the Social Security Administration. The ALJ did not elaborate further on his consideration of the VA rating. The ALJ also stated that Plaintiff's medical authorization for a handicapped parking permit did not prove that Plaintiff was disabled under the Act. The ALJ pointed out that although handicapped permits are indicative of some health problems, they are not hard to obtain. The ALJ found that the VA's rejection of Plaintiff for vocational rehabilitation could not be presumed to be "entirely, or even mainly," due to medical reasons, as other reasons were stated to have been taken into account, including a personal interview and Plaintiff's vocational and educational histories. Tr. at 15-16.

The ALJ found that Plaintiff's work record was somewhat "scattered and erratic," with fair to good earnings in some years, but mediocre earnings in most others. Noting

that a claimant's work record is only one factor to consider in assessing the claimant's credibility, the ALJ found that the preponderance of the medical and other evidence was inconsistent with Plaintiff's allegations of disability. Tr. at 16.

The ALJ first determined that the medical evidence did not establish any impairment or combination of impairments that met or equaled in severity the requirements of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Specifically, the ALJ considered the conclusions of Plaintiff's treating physician, Dr. Tillinghast, on March 11, 2000, and again on January 3, 2001, that Plaintiff could work as long as he avoided dust and mold exposure, heavy lifting, pushing, pulling, and working more than 40 hours a week. Tr. at 16.

The ALJ noted that Plaintiff's breathing problems were sometimes exacerbated because Plaintiff either ran out of or stopped taking prescribed inhalers or medications. The ALJ concluded that due to his exertional and nonexertional limitations, Plaintiff probably could not perform his past relevant work as a mail handler. The ALJ concluded, however, that Plaintiff could perform light work, consistent with the limitations set out by Dr. Leung in his March 11, 2004 report; and with the further limitation, imposed by Plaintiff's depression, that the work not be skilled work. Tr. at 18.

The ALJ stated that when Plaintiff had breathing problems after Dr. Tillinghast allowed Plaintiff to return to work on September 6, 2001, it was when Plaintiff was noncompliant with medications. The ALJ found that Plaintiff had no excuse for his "occasional noncompliance," and that there was no evidence that he had ever been refused

medication or access to medical treatment because of an inability to pay. The ALJ stated

that to the extent Plaintiff's daily activities were restricted, they were restricted by choice,

and not by any clear medical restriction. Tr. at 19.

The ALJ then found that on the issue of depression or other mood disorder, the

preponderance of the medical evidence showed that Plaintiff's condition had never been

severe over a long period of time. The ALJ concluded that Plaintiff's basic abilities to

think, understand, communicate, concentrate, get along with other people, and handle

normal work stress had never been significantly impaired on any documented long-term

basis. The ALJ observed that at the evidentiary hearing, Plaintiff displayed no obvious

signs of depression, anxiety, memory loss, or other disturbance. Tr. at 19.

Based upon the VE's interrogatory answers, the ALJ concluded that Plaintiff could

perform jobs that existed in significant numbers in the national economy, including

assembler, security guard, information clerk, and sales clerk. The ALJ therefore found

that Plaintiff was not disabled under the Act. Tr. at 18-20.

## STANDARD OF REVIEW AND STATUTORY FRAMEWORK

In reviewing the denial of Social Security disability benefits, a court must affirm

the Commissioner's decision "so long as it conforms to the law and is supported by

substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th

Cir. 2005) (quoted case omitted). This "entails 'a more scrutinizing analysis'" than the

substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir.

1989)). The court's review is more than an examination of the record for the existence of

substantial evidence in support of the Commissioner's decision; the court must also take into account whatever in the record fairly detracts from that decision. Id. (citation omitted). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to SSI benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id. § 423(d)(2)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment, or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities, including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; understanding, carrying out and remembering simple

instructions; using judgment, responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

If the claimant's impairment is not severe, the claim is denied.  If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Appendix 1).  If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work, if any.  If the claimant has past relevant work and is able to perform it, he is not disabled.  If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

Where a claimant cannot perform the full range of work in a particular category of work defined at 20 C.F.R. § 1567 (very heavy, heavy, medium, light, and sedentary) due to nonexertional impairments, such as pain or mental disorders, the Commissioner must present testimony by a VE to meet her burden at step five.  Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998).  A VE's response to a hypothetical question that includes all of a claimant's impairments and limitations can constitute substantial evidence at step five

to support a conclusion of no disability.  Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).  The hypothetical question must capture "the concrete consequences of a plaintiff's deficiencies."  Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997).  The question need not include alleged limitations which the ALJ properly discredits.  Haggard v. Apfel, 175 F.3d 591, 594-95 (8th Cir. 1999).

## DISCUSSION

### VA's Determination that Plaintiff was Unemployable and Ineligible for Vocational Rehabilitation, and State's Issuance of a Handicapped Permit

Plaintiff argues that the ALJ erred in failing to properly address the determination by the VA in November 2001 that Plaintiff was 60 percent disabled and 100 percent unemployable.  The Commissioner maintains that the ALJ properly considered the VA's decision and rejected it, and properly evaluated all the evidence in accordance with Social Security standards.

In Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998), the Eighth Circuit held that although the decision by the VA that the plaintiff was disabled was not binding on the Commissioner, the decision was "important enough to deserve explicit attention" and the ALJ's failure to mention it in his decision required remand.  Other circuits concur with this approach.  See McCartney v. Massanari, 298 F.3d 1072, 1075 (9th Cir. 2002) (citing Morrison v. Apfel and cases from eight other circuits and noting "no circuit has held that an ALJ is free to disregard a VA disability rating").

Here, as Plaintiff argues, the ALJ mentioned the VA's November 2001 decision that Plaintiff was 60 percent disabled and 100 percent unemployable, but failed to give his

reasons for discounting it, other than to state that the VA's findings were not binding on the Social Security Administration. This is not a case such as <u>Brown v. Massanari</u>, 2001 WL 1352234 (8th Cir. Nov. 5, 2001) (per curiam), in which the Eighth Circuit held that the ALJ's failure to discuss explicitly the VA's determination of disability was "inconsequential" because the determination consisted of two pages and reported findings that were not supported in the record before the ALJ. Here, the VA decision is rather detailed, and its reported findings are supported by the record.

The ALJ's stated reasons for discounting the VA's determination that Plaintiff was not eligible for vocational rehabilitation and employment services is somewhat problematic. The ALJ reasoned that the VA's determination may have been based on factors other than his medical condition, yet there is no indication in the record that anything other than Plaintiff's medical condition would have rendered him unable to train for or get a suitable job.

Upon review of the record, the Court also finds other aspects of the ALJ's analysis troubling. The ALJ's statement that when Plaintiff had breathing problems after Dr. Tillinghast allowed him to return to work on September 6, 2001, Plaintiff had been noncompliant with medications, is not supported by the record. The Court finds only one mention in the record of Plaintiff's noncompliance with his respiratory medications -- on August 15, 2002, and neither the ALJ nor the Commissioner points to other occasions -- whereas the record documents asthma exacerbations after September 6, 2001. In addition,

Plaintiff explained that he was noncompliant on this occasion due to the lack of funds.[5]

Also troubling is the ALJ's failure to consider the number of days Plaintiff might have to miss work due to his respiratory problems. As a consequence, the hypothetical posed to the VE did not include such a limitation. It is clear from the record that Plaintiff had to miss numerous days from work at the Postal Service due to his COPD, and there is no indication that his condition improved since then.

The Court also notes that the pulmonary function studies conducted on December 6, 2003, suggest that Plaintiff's post-bronchodilator FEV1 value would have been very close to, if not equal to, the severity level of § 3.01of Appendix 1.

The Court believes that in light of the above, the decision of the Commissioner must be reversed and the case remanded to the ALJ for further consideration of the record. If the ALJ determines that the VA's disability/employablity determination is not to be credited, the ALJ should provide specific reasons for this conclusion. In addition, the ALJ should consider obtaining the testimony of a medical expert to evaluate the severity of Plaintiff's COPD during the relevant time frame, as well as an opinion of whether and how often Plaintiff might have to miss work due to his medical condition. Additional vocational expert testimony might also be necessary.

## CONCLUSION

Accordingly,

---

[5]    The Court notes that when a plaintiff's failure to follow prescribed treatment is due to the lack of sufficient financial resources and education, a finding of disability is not precluded. See Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984).

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**REVERSED,** and this case is **REMANDED** for further consideration.

An appropriate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 24th day of March, 2006